UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD GERBER | : | CIVIL NO: 1:14-CV-00674 |
| | : | |
| Plaintiff | : | |
| | : | (Chief Judge Conner) |
| v. | : | |
| | : | (Magistrate Judge Schwab) |
| WARDEN WILLIAM CAMPBELL, | : | |
| *et al.,* | : | |
| Defendants | : | |
| | : | |

## REPORT AND RECOMMENDATION

**I.  Introduction.**

The plaintiff, Richard Gerber, was committed to the Columbia County Prison as a technical parole violator.  He claims that, during his short stay there, the defendants violated his constitutional rights.  Two of the three defendants filed a motion to dismiss Gerber's amended complaint.  For the reasons that follow, we recommend that the motion to dismiss be granted in part and denied in part.  More specifically, we recommend that the court dismiss all claims against the two moving defendants with the exception of a single retaliation claim.

## II.  Background and Procedural History.

Gerber began this case by filing a complaint and an application for leave to proceed *in forma pauperis.*  We granted Gerber leave to proceed *in forma pauperis*, and after screening the complaint, we concluded that two of the seven named defendants were entitled to Eleventh Amendment immunity and that the complaint failed to state a claim upon which relief may be granted against the other five defendants.  We granted Gerber leave to file an amended complaint.

Gerber then filed an amended complaint naming three defendants: (1) William Campbell, the Warden of the Columbia County Prison; (2) Corrections Officer Burd; and (3) a first shift nurse, who Gerber could not identify by name. Gerber alleges that, in November of 2013, he was recommitted to the Pennsylvania Department of Corrections (DOC) as a technical parole violator.  In early January of 2014, the Pennsylvania Board of Probation and Parole (Board) decided to recommit Gerber as a technical parole violator to a state correctional institution or a county jail to serve six months pursuant to Act 122 of 2012.  The Board's decision stated that, on May 12, 2014, Gerber will be reparoled automatically without further Board action provided that he does not, among other things, commit a disciplinary infraction involving assaultive behavior. *Doc. 7-1* at 1.

Thereafter, on February 6, 2014, Gerber was transferred to the Columbia County Prison to serve his parole-violation term.  According to Gerber, upon his

arrival at the Columbia County Prison, he discovered that the conditions of confinement there were inferior to those provided by the DOC at state institutions. Gerber alleges that, during his orientation, he voiced a multitude of concerns in the presence of Warden Campell, who told Gerber that he was stuck at the Columbia County Prison until his release and that, if he were removed from the prison, his parole date potentially could be rescinded. That same evening, Gerber prepared various grievances concerning his conditions of confinement at the Columbia County Prison, and he submitted those grievances the following morning. Gerber was then transferred from a dormitory block to D Block. Gerber continued to submit grievances, and he requested a Section 1983 complaint form, which was never provided.

Gerber alleges that, on February 10, 2014, while he was exercising on the Block, another inmate—Harris—approached him and a verbal confrontation ensued. According to Gerber, Harris and two other inmates then assaulted him by hitting and kicking him in the head and face. Gerber alleges that he did not defend himself for fear of incurring a misconduct that could lead to the rescission of his reparole date. Gerber alleges that Officer Burd, who was the assigned officer on the Block at the time of the altercation, remained in a locked control booth until other officers responded.

After the attack, the first shift duty nurse examined Gerber, but the only medical care she provided was to an abrasion on Gerber's face. Gerber alleges that although he was experiencing excruciating pain in his head and his left elbow and the nurse determined that he likely suffered a concussion, she told him to just "shake it off." According to Gerber, she did not provide him with any pain medication or any ice for his obvious swelling. After the examination, Gerber was escorted to the Restricted Housing Unit, where, he alleges, his pain became so intense that he summoned the RHU officer, who told Gerber that he could do nothing for him.

According to Gerber, a few hours later he had several seizures. The evening duty nurse then ordered that an ambulance be summoned, and Gerber was taken by ambulance to Geisinger Hospital. There, medical professionals determined that Gerber had suffered a concussion and a fractured left elbow. Later that evening, Gerber was returned to the prison, where he received no further medical attention.

After Gerber returned from the hospital, he notified the shift lieutenant that he wanted to pursue criminal charges against his attackers, and the next morning, he met with Warden Campbell and reiterated his desire to contact the police and pursue criminal charges. According to Gerber, Campbell denied his request to contact the police and told him that he was not attacked, but rather he was involved in a fight. Gerber alleges that Campbell, knowing that Gerber's reparole date

4

would more than likely be rescinded, also told him that he was being removed

from the Columbia County Prison and returned to the DOC.  Warden Campbell

allegedly stated that the catalyst for the removal was the fact that Gerber liked to

file grievances.

Gerber then contacted his wife, who arranged a telephone call between him

and the Bloomsburg Police Department, and Patrolman Golla came to the prison

within an hour after that phone call.  Discouraged with the direction of Golla's

interview of him, Gerber abruptly ended the interview.

An hour later, Gerber alleges, he received a misconduct, purportedly

prepared by Officer Burd, charging him with nine different institutional

infractions.  The incident report, which Gerber attached to his amended complaint

as an exhibit, includes the following statement by Officer Burd:

> On the above date and time, this officer overheard inmates
> Harris and Gerber arguing.  At this time, this officer overheard
> Gerber shout "Nigger" at inmate Harris.  Inmate Harris then
> swung at inmate Gerber and a fight ensued.  This officer exited
> the control booth and called for assistance.  This officer ordered
> all inmates to lock down and ordered inmates Gerber and Harris
> to break it up.  Both inmates stopped fighting but inmate Gerber
> continued with his racists comments by stating, "It's your guys'
> fault for putting me here with monkeys."  Available rovers
> responded and Unit D-South was locked down.  Inmate Gerber
> and Harris were removed to Unit E without incident.

> Note—After review of the cameras, inmates Miller and Ross
> are clearly shown engaging in the altercation.  Both inmates
> were then moved to Unit E without incident.

*Doc. 7-1* at 8.  Gerber alleges that none of the charges against him were supported by the facts provided in Burd's report.  According to Gerber, the attack on him was captured by video surveillance, which will substantiate his claims.

Less than 24 hours after Gerber received the misconduct and without receiving a misconduct hearing, he was transferred from the Columbia County Prison back to the DOC.  Back in DOC custody, Gerber was informed that as a result of being removed from the Columbia County Prison and receiving a misconduct, his case was being forwarded to the Board for further review.

Gerber then submitted a grievance about the misconduct to Warden Campbell, who denied the grievance, stating among other things, that Gerber was found guilty of two charges—racial slurs and fighting—by the Disciplinary Committee based on Officer Burd's written statement and a review of the videotape.  *Doc. 7-1* at 12.  But because of "several procedural errors made by staff at Columbia County Prison," Warden Campbell granted Gerber's subsequent appeal and expunged the misconduct. *Doc. 7-1* at 17.  According to Gerber, although Campbell expunged the misconduct, the damage had already been done as the Board rescinded[1] his automatic reparole date as a result of the misconduct.

---

[1] Although Gerber alleges that his reparole was revoked, since it is clear that Gerber had not actually been reparoled at the time, we construed him to be alleging that his reparole date was rescinded.

Gerber alleges in his amended complaint that his status with the Board remains uncertain as he will not see the Board until the next available docket.

Patrolman Golla eventually charged Inmate Harris with criminal assault, which, Gerber contends, negates the prison officials' interpretation of the events and supports his claim of being attacked.   According to Gerber, the only two charges that potentially could have resulted in the rescission of his automatic reparole date were the assault and fighting charges, which charges are negated by Patrolman Golla's charge against Inmate Harris.

Gerber claims that Warden Campbell and the first shift duty nurse acted with deliberate indifference to his medical needs after the attack in violation of the Eighth Amendment.  He also claims that Warden Campbell and Officer Burd fabricated facts to have him removed from the Columbia County Prison in violation of the Eighth Amendment.  Further, he claims that Warden Campbell retaliated against him for filing grievances and for contacting the Bloomsburg Police Department in violation of the First and Eighth Amendments.  Finally, Gerber claims that Warden Campbell denied him due process and violated the Eighth Amendment by not providing him with a misconduct hearing and having him removed from the prison without a hearing knowing that his reparole date would be rescinded.

### III.  Motion to Dismiss and Pleading Standards.

In accordance with Fed.R.Civ.P. 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  When reviewing a motion to dismiss, "[w]e must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).  In making that determination, we "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230. "A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 769-70 (M.D. Pa. 2012).  "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009).  The statement required by Rule 8(a)(2) must give the defendant fair notice of what the plaintiff's claim is and of the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  Detailed factual allegations are not required, but more is required than labels, conclusions, and a formulaic recitation of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

(2007). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). "A complaint has to "show" such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief can be granted, the court must accept as true all well-pleaded factual allegations in the complaint, must draw all reasonable inferences from the complaint, and must construe the complaint in the light most favorable to the plaintiff. *Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.,* 20 F.3d 1250, 1261 (3d Cir. 1994). A court, however, "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal,* a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where

there are well-pleaded factual allegations, a court should
assume their veracity and then determine whether they
plausibly give rise to an entitlement for relief.'

*Santiago v. Warminster Tp.,* 629 F.3d 121, 130 (3d Cir. 2010)(quoting *Iqbal,* 556

U.S. at 675 & 679).

A complaint filed by a *pro se* litigant is to be liberally construed and

"'however inartfully pleaded, must be held to less stringent standards than formal

pleadings drafted by lawyers.'" *Erickson,* 551 U.S. at 94 (quoting *Estelle v.*

*Gamble,* 429 U.S. 97, 106 (1976)).  Nevertheless, "pro se litigants still must allege

sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina,*

*Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).  Thus, a well-pleaded complaint must

contain more than mere legal labels and conclusions.  Rather, a *pro se* complaint

must recite factual allegations that are sufficient to raise the plaintiff's claimed

right to relief beyond the level of mere speculation, set forth in a "short and plain"

statement of a cause of action.

**IV.  Discussion.**

Gerber's claims are brought under 42 U.S.C. § 1983.  "Section 1983

imposes civil liability upon any person who, acting under the color of state law,

deprives another individual of any rights, privileges, or immunities secured by the

Constitution or laws of the United States." *Shuman v. Penn Manor School Dist.,*

422 F.3d 141, 146 (3d Cir. 2005).  Section 1983 "does not create any new

substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." *Id.* To establish a claim under § 1983, the plaintiff must establish a deprivation of a federally protected right and that this deprivation was committed by a person acting under color of state law. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).

### A.  Punitive Damages Against the Defendants in Their Official Capacities.

Gerber is seeking punitive damages against the defendants in their official capacities as well as "[a]ny additional relief this court deems just, proper, and equitable." *Doc. 7* at 13.  Gerber cannot, however, recover punitive damages against the defendants in their official capacities.

Official-capacity suits are "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n. 55 (1978).  In an official-capacity suit, the entity of which the officer is an agent is the real party in interest. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  "[A] municipality is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  "Since a municipality cannot be liable for punitive damages, neither can an individual sued in her official capacity." *Strickland v. Mahoning Twp.*, 647 F. Supp. 2d 422, 428 (M.D. Pa. 2009).

Because the defendants are municipal actors, Gerber cannot recover punitive damages against them in their official capacities.  Given that Gerber is proceeding *pro se*, we will construe his request for additional relief as a request for damages against the defendants in their individual capacities.

### B.  Eighth Amendment Claims.

Defendant Campbell contends that the amended complaint fails to state an Eighth Amendment medical claim against him because it does not contain allegations that he exhibited deliberate indifference to a serious medical need of Gerber.  More specifically, defendant Campbell contends that the amended complaint does not contain allegations that he knew that Gerber sustained an injury or suffered from a serious medical need and that he cannot be liable based on Gerber's disagreement with the treatment provided by the nurse.

In order for a plaintiff to allege a viable Eighth Amendment medical claim, he must allege facts from which it can reasonably be inferred that the defendant acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *see also Groman v. Township of Manalapan,* 47 F.3d 628, 637 (3d Cir. 1995)("Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs.").

A medical need is serious if it "has been diagnosed by a physician as requiring treatment" or if it "is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)(quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd,* 649 F.2d 860 (3d Cir. 1981)(table)).   Additionally, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (quoting *Estelle,* 429 U.S. at 103).   Further, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Id.*

Deliberate indifference is a subjective standard. *Farmer v. Brennan*, 511 U.S. 825, 840 (1994).   "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney,* 571 F.3d 318, 330 (3d Cir. 2009).   To act with deliberate indifference, the prison official must have known of the substantial risk of serious harm and must have disregarded that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 837.   "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*   The Third Circuit has found deliberate indifference where a prison official: "(1) knows of a prisoner's need for medical

treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999).  The Third Circuit has also held that "[n]eedless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, . . . violates the Eighth Amendment." *Atkinson v. Taylor,* 316 F.3d 257, 266 (3d Cir. 2003).

At the same time, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as a constitutional claim because medical malpractice is not a constitutional violation. *See Farmer,* 511 U.S. at 835 (holding that "deliberate indifference describes a state of mind more blameworthy than negligence"*); Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir. 2004)("Allegations of medical malpractice are not sufficient to establish a Constitutional violation."); *Singletary v. Pa. Dep't of Corr.,* 266 F.3d 186, 192 n. 2 (3d Cir. 2002)(claims of medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment). Instead, deliberate indifference represents a much higher standard, one that requires "obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Rouse,* 182 F.3d at 197 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).

"Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir. 1993)(citations omitted).  And courts will "disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment." *Spencer v. Courtier*, 552 F. App'x 121, 124 (3d Cir. 2014)(quoting *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).  "Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim." *Caldwell v. Luzerne Cnty. Corr. Facility Mgmt. Employees*, 732 F. Supp. 2d 458, 472 (M.D. Pa. 2010).

Further, a nonmedical prison official is not deliberately indifferent simply because he or she failed to respond to a prisoner's medical complaints when the prisoner was already being treated by a prison doctor. *Durmer*, 991 F.2d at 69. "Absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill*, 372 F.3d at 236.

Gerber does not allege that Warden Campbell was involved in his medical treatment or was aware of the nurse's alleged failure to properly treat him. Further, there no allegations that Campbell was even aware of Gerber's medical condition after the altercation.  There simply are no factual allegations in the

amended complaint that could lead to a reasonable inference that Campbell was deliberately indifferent to a serious medical need of Gerber. Accordingly, the amended complaint fails to state an Eighth Amendment medical claim against Warden Campbell.

Gerber claims that defendants Campbell and Burd violated the Eighth Amendment by fabricating facts to have him removed from the Columbia County Prison and that Campbell had him transferred from the Columbia County Prison without a hearing in retaliation for grievances Gerber filed. "It has long been recognized that prison transfer decisions, standing alone, do not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution." *Stokes v. Wetzel*, No. CIV.A. 3:14-0732, 2014 WL 1745885, at *2 (M.D. Pa. Apr. 30, 2014). And Gerber has not alleged facts from which it can reasonably be inferred that his transfer resulted in the deprivation of "the minimal civilized measure of life's necessities," a necessary element of an Eighth Amendment claim. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Accordingly, the amended complaint fails to state an Eighth Amendment claims against defendants Campbell and Burd based on Gerber's transfer.

The amended complaint also asserts an Eighth Amendment medical claim against defendant First Shift Nurse, but she was not served in this case because Gerber did not identify her. In response to a motion to compel, defendants

16

Campbell and Burd have now identified this defendant as Kelly Henry. They assert, however, that she no longer works at the Columbia County Prison. By a separate order we have ordered Gerber to provide an address for Kelly Henry so that the amended complaint can be served on her.

## C. Retaliation Claim.

Gerber claims that Warden Campbell violated the First Amendment by transferring him from the Columbia County Prison in retaliation because he filed grievances and because he contacted the Bloomsburg Police Department.

Retaliation claims are judged against exacting legal standards. A prisoner claiming that a defendant retaliated against him for exercising his constitutional rights must prove that: (1) his conduct was constitutionally protected; (2) he suffered "adverse action" at the hands of the defendant; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision of the defendant. *Carter v. McGrady,* 292 F.3d 152, 158 (3d Cir. 2002). "Once a prisoner has made his *prima facie* case, the burden shifts to the defendant to prove by a preponderance of the evidence that [he or she] 'would have made the same decision absent the protected conduct for reasons reasonably related to penological interest.'" *Id.* (quoting *Rauser v. Horn*, 241 F.3d 330, 334 (3rd Cir. 2001)).

Warden Campbell does not argue that Gerber has not adequately alleged that he engaged in constitutionally protected conduct.  Nor does Campbell argue that Gerber's transfer from the Columbia County Prison was not an adverse action. Rather, Warden Campbell focuses on the third element of a retaliation claim and argues that Gerber has failed to allege facts showing that his contacting the police or his filing grievances was a substantial or motivating factor in the decision to transfer him.  Gerber alleges, however, that Warden Campbell told him that he was being transferred during the same conversation in which Gerber stated his intent to contact the police, and Gerber alleges that Warden Campbell told him that the catalyst for the transfer was the fact that Gerber liked to file grievances.  Accepting these allegations as true, as we must when deciding a motion to dismiss, we conclude that Gerber has alleged sufficient facts from which it can reasonably be inferred that his constitutionally protected conduct was a substantial or motivating factor in the decision to transfer him.

Warden Campbell argues that Gerber did not actually file his grievance until after he was transferred, and so there could not have been a causal connection between the filing of the grievance and the transfer.  But this argument is based on a misreading of the amended complaint.  Although Gerber alleges that he filed a grievance regarding the misconduct after he was transferred, he also alleges that he filed grievances prior to being transferred.  And, as set forth above, he has alleged

18

facts from which it can reasonably be inferred that his constitutionally protected conduct was a substantial or motivating factor in the decision to transfer him. Accordingly, the amended complaint states a First Amendment retaliation claim against Warden Campbell upon which relief can be granted.

### D.  Due Process Claim.

Gerber claims that Warden Campbell denied him due process by not providing him with a misconduct hearing and having him removed from the prison without a hearing knowing that Gerber's reparole date would be rescinded. Warden Campbell is entitled to qualified immunity as to Gerber's due process claim because it is not clearly established that, under the circumstances of this case, Gerber had a liberty interest protected under the Due Process Clause.[2]

Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil

---

[2]  Although Warden Campbell did not raise qualified immunity, the Court may address qualified immunity *sua sponte* "where it is clear on the face of the complaint that a party is immune from suit." *Newland v. Reehorst*, 328 F. App'x 788, 791 (3d Cir. 2009)(citing 28 U.S.C. § 1915(e)(2)(B)(iii), which provides that in a case in which the plaintiff is proceeding *in forma pauperis* "the court shall dismiss the case at any time if the court determines that . . . the action . . . seeks monetary relief against a defendant who is immune from such relief."); *see also Illes v. Kcomt*, No. 1:12-CV-0395, 2014 WL 297352, at *2 (M.D. Pa. Jan. 27, 2014)("In appropriate cases, the district court is entitled to address the defense *sua sponte*.").

damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)(quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Id.*  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818-19.

The qualified immunity analysis has two prongs. *Pearson,* 555 U.S. at 232. One prong of the analysis is whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.*  The other prong of the analysis is whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 194, 201 (2001).  The court is permitted to exercise its discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first in light of the circumstances of the particular case. *Pearson,* 555 U.S. at 236.  So it may forego difficult constitutional issues and award qualified immunity to a defendant

20

if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. *Id.*

Under the first prong of the qualified immunity analysis, we ask whether Gerber has stated a due process claim upon which relief can be granted. The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV, §1. A due process claim requires a two-part analysis. First, the court must determine whether the interest asserted by the plaintiff is within the scope of protection of life, liberty, or property found in the Due Process Clause. *Shoats v. Horn,* 213 F.3d 140, 143 (3d Cir.2000). Second, if the interest is one that is protected by the Due Process Clause, "the question then becomes what process is due to protect it." *Id.*

Neither life nor property were at stake with respect to the misconduct issued to Gerber. Thus, Gerber has a viable due process claim only if he had a liberty interest protected by the Due Process Clause. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word "liberty," or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)(citations omitted). Thus, "[a] prisoner may be deprived of a liberty interest in violation of the Constitution in two ways: (1) when severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for

notice and an adequate hearing, and (2) when state statutes and regulations create a liberty interest in freedom from restraint that imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life,' thereby triggering due process protection." *Renchenski v. Williams,* 622 F.3d 315, 325 (3d Cir. 2010)(citations omitted).  "The first is the so-called independent due process liberty interest, while the latter is the so-called state-created liberty interest." *Id.*

The misconduct, which Gerber alleges resulted in the rescission of his reparole date, does not implicate an independent due process liberty interest. *See Swarthout v. Cooke*, 562 U.S. 216, 220 (2011)("There is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners."); *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7 (1979)(the Constitution creates no liberty interest in parole); s*ee also Jago v. Van Curen,* 454 U.S. 14 (1981)(rejecting claim that prisoner had a liberty interest in the rescission of parole).  So, we turn to whether Gerber had a state-created liberty interest.

In *Sandin v. Conner,* 515 U.S. 472 (1995), the United States Supreme Court, addressing the question of when the state can create liberty interests protected by the Due Process Clause, held that:

> States may under certain circumstances create liberty interests
> which are protected by the Due Process Clause. But these

> interests will be generally limited to freedom from restraint
> which, while not exceeding the sentence in such an unexpected
> manner as to give rise to protection by the Due Process Clause
> of its own force, nonetheless imposes atypical and significant
> hardship on the inmate in relation to the ordinary incidents of
> prison life.

*Id.* at 483-84.  In *Sandin,* the inmate was sentenced to thirty days of disciplinary

confinement in the Special Holding Unit.  As a result of the prisoner's disciplinary

segregation he "had to spend his entire time alone in his cell (with the exception of

50 minutes each day on average for brief exercise and shower periods, during

which he nonetheless remained isolated from other inmates and was constrained by

leg irons and waist chains)." *Id.* at 494 (Breyer, J. dissenting).  The Court

concluded that the inmate's thirty days in the Special Holding Unit, considered

within the context of prison confinement, did not impose the type of atypical and

significant deprivation of liberty in which the state could be seen to have created a

liberty interest. *Id.* at 486.  The Court noted that disciplinary confinement at the

prison in question, with only insignificant exceptions, mirrored conditions imposed

on inmates in administrative and protective custody; that based on a comparison of

inmates inside of and outside of disciplinary segregation, placement in segregation

for thirty days did not work a major disruption in the inmate's environment; that

disciplinary action did not inevitably affect the duration of the inmate's sentence;

and that the "regime to which [the inmate] was subjected was within the range of

confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at 486–87.

"After *Sandin,* it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin,* 545 U.S. 209, 223 (2005) (quoting *Sandin, supra,* 515 U.S. at 484). In deciding whether a protected liberty interest exists under *Sandin,* we consider the duration of the confinement and the conditions of that confinement in relation to other prison conditions. *Mitchell v. Horn,* 318 F.3d 523, 532 (3d Cir. 2003). Whether a protected liberty interest exists under *Sandin* requires inquiry into the specific facts of the case. *Id.* at 533. But "inmates are generally not entitled to procedural due process in prison disciplinary hearings because the sanctions resulting from those hearings do not usually affect a protected liberty interest." *Burns v. Pennsylvania Dept. of Corrections,* 642 F.3d 163, 171 (3d Cir. 2011).

In this case, Gerber alleges that although the misconduct was expunged, he had a liberty interest in his automatic reparole date. It has long been held, however, that in Pennsylvania, the Board has broad discretion in deciding when, or if, a prisoner should be released on parole, and a Pennsylvania prisoner does not

have a liberty interest in being released on parole. *Gordon v. Wenerowicz*, No.

1:10-CV-1257, 2011 WL 5509538, at \*3 (M.D. Pa. Nov. 10, 2011)("Both the

federal and Pennsylvania state courts have held that parole is not a constitutionally

protected liberty interest under Pennsylvania law."); *Rogers v. Pennsylvania Bd. of*

*Probation and Parole*, 724 A.2d 319, 323 (Pa. 1999)(holding that under

Pennsylvania law, parole is a matter of grace and mercy shown to a prisoner and

the Board's decision to grant or deny parole does not affect a liberty interest).

Similarly, it has been held that a Pennsylvania prisoner does not have a liberty

interest with respect to an unexecuted grant of parole. *See Josey v. Pennsylvania*

*Bd. of Prob. & Parole*, No. 1:13-CV-0043, 2014 WL 310448, at \*1 &5 (M.D. Pa.

Jan. 28, 2014)(adopting report and recommendation, which stated that "[u]nder

Pennsylvania law, a prisoner does not attain the status of a "parolee" until the grant

of parole is executed and the prisoner is actually released on parole" and "[u]ntil

that time, an unexecuted grant of parole may be rescinded by the Board without

implicating procedural due process.").

Further, the Supreme Court has rejected the contention that a prisoner has a

liberty interest with respect to misconduct proceedings merely because the

misconduct may be taken into consideration in the parole process:

> Nor does Conner's situation present a case where the
> State's action will inevitably affect the duration of his sentence.
> Nothing in Hawaii's code requires the parole board to deny
> parole in the face of a misconduct record or to grant parole in

its absence, Haw.Rev.Stat. §§ 353–68, 353–69 (1985), even though misconduct is by regulation a relevant consideration, Haw.Admin.Rule § 23–700–33(b) (effective Aug. 1992). The decision to release a prisoner rests on a myriad of considerations. And, the prisoner is afforded procedural protection at his parole hearing in order to explain the circumstances behind his misconduct record. Haw.Admin.Rule §§ 23–700–31(a), 23–700–35(c), 23–700–36 (1983). The chance that a finding of misconduct will alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process Clause. The Court rejected a similar claim in *Meachum,* 427 U.S., at 229, n. 8, 96 S.Ct., at 2540 (declining to afford relief on the basis that petitioner's transfer record might affect his future confinement and possibility of parole).

*Sandin v. Conner*, 515 U.S. 472, 487 (1995).

Gerber suggests that he nevertheless had a liberty interest at stake in connection with the misconduct proceedings because in accordance with Act 122 of 2012 he already had an automatic reparole date that was rescinded because of the misconduct. During the 2011–12 session of the Pennsylvania General Assembly, Senate Bill 100, known as Act 122 of 2012, was passed and was signed into law on July 5, 2012. *Barge v. Pennsylvania Bd. of Prob. & Parole*, 96 A.3d 360, 361 (Pa. 2014). Section 15 of Act 122, amended 61 Pa.C.S.A. § 6138(d) to provide for automatic reparole dates for certain parolees provided that, among other things, the parolee does not commit a disciplinary infraction involving assaultive behavior.[3]

---

[3]  61 Pa.C.S.A. § 6138(d), as amended by Act 122 of 2012, provides:

We have not found any cases concerning whether Act 122 creates a state-created liberty interest in a parolee receiving reparole after the period set forth in the statute.  We doubt, however, that Gerber had a liberty interest in not receiving the misconduct at issue here, which he contends resulted in rescission of his automatic reparole date.  In the state-created liberty interest inquiry, "we do not compare the prisoner's own life before and after the deprivation." *Powell v. Weiss*, 757 F.3d 338, 344 (3d Cir. 2014).  "Rather, '[t]he baseline for determining what is

---

A technical [parole] violator recommitted to a State correctional institution or a contracted county jail under subsection (c) shall be recommitted as follows:

. . .

(3) Except as set forth in paragraph (4) or (5), the parolee shall be recommitted for one of the following periods, at which time the parolee shall automatically be reparoled without further action by the board:

(i) For the first recommitment under this subsection, a maximum period of six months.

(ii) For the second recommitment under this subsection for the same sentence, a maximum or nine months.

(iii) For the third or subsequent recommitment under this subsection for the same sentence, a maximum of one year.

(4)  The parolee may be reparoled by the board prior to the time period under paragraph (3) if the board determines that it is in the best interest of the Commonwealth and the parolee.

(5) The time limit under paragraph (3) shall not be applicable to a parolee who:

(i) Committed a disciplinary infraction involving assaultive behavior, sexual assault, a weapon or controlled substances;

(ii) Spent more than 90 days in segregated housing due to one or more disciplinary infractions; or

(iii) Refused programming or a work assignment.

27

'atypical and significant'—the 'ordinary incidents of prison life'—is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law.'" *Id.* (quoting *Asquith v. Dep't of Corr.* 186 F.3d 407, 412 (3d Cir. 1999)).  Here, Gerber alleges that the misconduct resulted in rescission of his reparole date, which meant that he remained in prison.  But remaining in prison for the duration of a sentence is "not an 'atypical or significant hardship' for a convicted criminal." *Id.*  Moreover, under 61 Pa.C.S.A. § 6138, the Board retains the discretion to reparole a technical parole violator even when an automatic reparole date is not applicable. *See* 61 Pa.C.S.A. § 6138(c)(4) ("Subject to subsection (e) [dealing with parole violators recommitted to a community corrections center or a community corrections facility], the parolee shall be subject to reparole by the board whenever in its opinion the best interests of the inmate justify or require the parolee being reparoled and it does not appear that the interests of the Commonwealth will be injured reparoling the parolee.").

   Further, we note that shortly after Gerber filed his amended complaint, he filed a letter (doc. 8) notifying the Court that the Board reinstated his reparole, stating that he would be released on May 19, 2014, and providing his new address. Although at the time he filed his amended complaint Gerber alleged that his

reparole dated had been rescinded and that his current status with the Board was uncertain, his later filing indicates that his reparole was in fact reinstated.[4]

Even if Act 122 changed the law with respect to whether the rescission of a parole date implicates a liberty interest, because it is was not clearly established at the time of the events in this case that it did so, Warden Campbell is entitled to qualified immunity with respect to Gerber's due process claim. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. "This is an objective inquiry, to be decided by the court as a matter of law." *Doe v. Groody*, 361 F.3d 232, 238 (3d Cir. 2004). Because this inquiry focuses on the official's actual situation, the analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition. . . ." *Montanez v. Thompson*, 603 F.3d 243, 251 (3d Cir. 2010) (quoting *Saucier,* 533 U.S. at 201). "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson,* 555 U.S. at 244 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)). If the law did not put the officer on notice that his conduct would be clearly unlawful, qualified immunity is appropriate. *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186,

---

[4]  Gerber's original reparole date was May 12, 2014, but Gerber's letter suggests that he was not released until May 19, 2014.

193 (3d Cir. 2009). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012) (quoting *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011)).

At the time of the events in this case, it was not clearly established that a parole violator had a liberty interest with respect to an automatic reparole date. The parties have cited no Supreme Court or Third Circuit cases so holding, and the Court has found none. Moreover, the Third Circuit has repeatedly, and recently, held (albeit without any discussion of or reference to Act 122)[5] that a misconduct which resulted on the rescission of a parole date does not implicate a liberty interest. *See Fantone v. Latini,* 780 F.3d 184, 190 (3d Cir. 2015)(citing *Barna v. Boyce,* 563 F. App'x 103 (3d Cir. 2014) and *Boone v. Nose*, 530 F. App'x 112 (3d Cir. 2013)) Because the law was not clearly established, Warden Campbell is entitled to qualified immunity with respect to Gerber's due process claim.

## V. Recommendations.

Accordingly, for the foregoing reasons, it is recommended that the motion (doc. 14) to dismiss the amended complaint filed by defendants Campbell and

---

[5] The amendment to 61 Pa.C.S.A. by Act 122 of 2012 did not become effective until January 2, 2013. *See Welshimer v. Pennsylvania Bd. of Prob. & Parole,* 83 A.3d 277, 279 (Commw. Ct. 2014). And it does not apply to a parole violator who was recommitted prior to that effective date. *Id.* Thus, it appears that the courts have yet to have to address the Act.

Burd be granted in part and denied in part.  It is recommended that all claims against defendants Campbell and Burd be dismissed except the retaliation claim against Campbell.  It is further recommended that the case be remanded to the undersigned for further proceedings.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 21st day of May, 2015.


_S/Susan E. Schwab_
Susan E. Schwab
United States Magistrate Judge